**IN THE UNITED STATES DISTRICT COURT**
**FOR THE UNITED STATES OF AMERICA**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ANDREW VAZQUEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:07-CV-0059-D** |
| | § | |
| **CITY OF GRAND PRAIRIE, and** | § | |
| **BRADLEY A. LEONARD, individually** | § | |
| **and in his official capacity,** | § | |
| | § | |
| **Defendants.** | § | |

## REPORT AND RECOMMENDATION

Pursuant to the District Court's Order (doc. 36), Defendants' Motion for Summary Judgment (doc. 33) has been referred to the United States Magistrate Judge for report and recommendation. Plaintiff filed a response on March 12, 2008 (doc. 40), and Defendants replied to the motion on March 27, 2008. For the reasons stated below, the Court recommends that Defendants' motion be **GRANTED**.

## BACKGROUND

Plaintiff Andrew Vazquez ("Vazquez") brought this action against Defendants, the City of Grand Prairie, Texas (the "City") and police officer Bradley A. Leonard ("Leonard"), individually and in his official capacity, (collectively "Defendants") on January 10, 2007. On February 12, 2007, Vazquez filed an Amended Complaint. Vazquez asserts multiple federal and state claims against Defendants. First, he argues that Defendants violated 42 U.S.C. § 1983 based on Leonard's alleged use of excessive force and his unlawful search and seizure of Vazquez. In addition to his federal claim, Vazquez also claims that Defendants are liable for intentional infliction of emotional distress

1

("IIED"), assault, and battery under Texas law.

These allegations stem from an incident on January 18, 2005, where Vazquez engaged police officers Robert Donahue ("Donahue") and Robert Vaughn ("Vaughn") of the City Police Department in a low speed pursuit after leaving a suspected narcotics house. (Pl.'s Amend. Compl. at 3.) A stolen vehicle had previously been recovered from that house and drugs had also been found in a vehicle leaving the house. (Def.'s Br. Supporting Mot. Summ. J. at 2.) Vazquez was driving a black four-door sport utility vehicle ("SUV") with a paper license tag, which appeared to have been altered. (*Id.*) Leonard assisted in this pursuit. (*Id.*) During the pursuit, Vazquez turned onto a cul-de-sac street. (*Id.*) Donahue and Leonard followed Vazquez into the cul-de-sac. (*Id.*) When Vazquez came to the end of the street, he made a u-turn. (*Id.*)

Leonard's in-car video camera captured the incident. (*Id.* at App. 175.) On the video, Vazquez can be seen making the u-turn and coming toward Leonard. (*Id.*) As Vazquez weaves in between Donahue's patrol car and a parked car, Leonard's patrol car slows. (*Id.*) Leonard's patrol car then stops with a parked car on his right and a curb on his left, and Leonard exits the patrol car. (*Id.*) Within a matter of seconds, Vazquez turns the wheel of the SUV and rams Leonard's patrol car. (*Id.*) He continues driving over the curb to the left of the patrol car, where Leonard is located. (*Id.*) Immediately after driving over the curb, thirteen shots fired by Leonard are heard on the video in rapid succession. (*Id.*) After the shots are fired, Vazquez drove across a yard, crossed the street, and crashed the SUV into a fence. (*Id.* at 4.)

Vazquez claims that because Leonard's patrol car was in the middle of the road, Vazquez was forced to steer to avoid a potential collision with Leonard's patrol car. (Pl.'s Amend. Compl. at 3.) While Vazquez was attempting to avoid the collision, Leonard exited his car and fired thirteen

rounds of ammunition at Vazquez who was fleeing the scene. (*Id.*) The Defendants claim that Leonard believed Vazquez was going to ram Leonard's car with the SUV. (Def.'s Br. Supporting Mot. Summ. J. at 3.) Leonard did not believe that he had time to move his patrol car out of Vazquez's path, so he decided to exit the patrol car. (*Id.* at 3–4.) While running away, Leonard fired his weapon believing that Vazquez was attempting to run him over. (*Id.*)

Vazquez was struck in the back by seven rounds of ammunition. (Pl.'s Amend. Compl. at 3.) He sustained numerous injuries to his body. (*Id.*) These injuries included injuries related to gunshot entry wounds, the extraction of bullets, and the presence of bullets in his body. (*Id.*)

## STANDARD OF REVIEW

The Court should only grant summary judgment if there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court views the facts in the light most favorable to the non-moving party. *Whittaker v. BellSouth Telecomm., Inc.*, 206 F.3d 532, 534 (5th Cir. 2000). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. If the non-movant bears the burden of proof at trial, the summary judgment movant may satisfy his burden by pointing to the absence of evidence supporting the non-movant's case. *Whittaker*, 206 F.3d at 534. At this point, the non-movant must show that summary judgment is not appropriate by going beyond the pleadings to demonstrate "specific facts showing that there is a genuine issue for trial." *Id.* Mere

conclusory allegations or denials unsupported by specific facts are not enough. *Id.* There must be evidence giving rise to reasonable inferences that support the non-moving party's position. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987). The material facts in this case are not disputed.

Since Plaintiff in this case is proceeding *pro se*, the Court must construe the allegations in the complaint liberally. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam); *Sec. & Exch. Comm'n v. AMX, Int'l, Inc.*, 7 F.3d 71, 75 (5th Cir. 1993) (per curiam). The Court has an obligation to construe a *pro se* plaintiff's brief more permissively and to make more allowances. *AMX, Int'l, Inc.*, 7 F.3d at 75. "[*P*]ro se litigant[s] [are] subject to less stringent standards than [those] represented by counsel." *Id.* (citing *Hughes v. Rowe*, 449 U.S. at 9).

## ANALYSIS

Vazquez first argues that Defendants violated 42 U.S.C. § 1983 "by using excessive force in the course of Defendants' pursuit and arrest of Mr. Vazquez" and "by attempting to detain Mr. Vazquez in violation of his Fourth Amendment expectation of privacy and guarantee to security from unreasonable search and seizure without reasonable suspicion and/or probable cause." (Pl.'s Amend. Compl. at 6.) He also claims that the City failed to intervene and covered up law enforcement misconduct. (*Id.*) In addition to his § 1983 claims, Vazquez alleges that Defendants are liable for IIED, assault, and battery. (*Id.* at 9–10.)

### A. SECTION 1983

Section 1983 provides a federal cause of action for a violation of an individual's civil rights. *See Gomez v. Toledo*, 446 U.S. 635, 638–40 (1980). Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere

conferred.'" *Graham v. Connor*, 490 U.S. 386, 394 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 (1979)). To establish a § 1983 claim, the plaintiff must show (1) "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" (2) by any person acting under the color of state law. *Gomez*, 446 U.S. at 638.

### 1. Excessive Force

A plaintiff claiming excessive force under § 1983 must first point to the specific constitutional right that was allegedly infringed through the application of force. *Graham*, 490 U.S. at 394. In this case, Vazquez alleges that Defendants violated his Fourth Amendment right. (Pl.'s Amend. Compl. at 6.) The second part of the § 1983 test is satisfied in this case; it is undisputed that Defendants, as a municipality and police officer, were acting under color of state law.

### a. Officer Leonard

In response to Vazquez's allegations, Leonard argues that he is protected by qualified immunity for his actions. Qualified immunity protects government officials who are performing discretionary functions from liability for damages. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The privilege of qualified immunity shields an officer from suit, rather than providing him with a defense to liability. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Determining whether a defendant is entitled to qualified immunity is analyzed under a two-part test. *Simmons v. City of Paris, Tex.*, 378 F.3d 476, 479 (5th Cir. 2004). *See also Saucier*, 533 U.S. at 201. If the defendant succeeds on either part of the test, qualified immunity exists. *See Simmons*, 378 F.3d at 479. The first part of the test considers whether the facts alleged, viewed in the light most favorable to the plaintiff, violates a constitutional right. *Saucier*, 533 U.S. at 201. If a constitutional right was violated, the court determines if that right was clearly established at the time of defendant's unlawful

conduct. *Id.*

### i. Constitutional Violation

Vazquez claims that Leonard's actions violated his Fourth Amendment rights. The Supreme Court has held that all claims of excessive force used "in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen" are correctly "analyzed under the [Fourth Amendment] 'reasonableness' standard." *Graham*, 490 U.S. at 395. To establish a prima facie case of excessive force under the Fourth Amendment, the plaintiff must show that he was seized, and as a result of that seizure he suffered "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Flores v. City of Palacios*, 381 F.3d 391, 391 (5th Cir. 2004). There is no dispute that Plaintiff was seized and injured from Leonard's use of force. Accordingly, the Court need only determine whether the force used was objectively unreasonable to determine if a constitutional violation exists.

Courts have consistently recognized that the use of some degree of force when making an arrest or investigatory stop is sometimes necessary. *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968)). In order to determine if the amount of force used is reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (quoting *United States v. Place*, 462 U.S. 696, 703 (1983). It is important to remember that the reasonableness of a specific use of force "must be judged from the perspective of a reasonable police officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry*, 392 U.S. at 20–22). Therefore, in determining whether a particular use of force is reasonable, the Court must allow for the fact that "police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and

rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.* at 397.

Moreover, an officer's subjective motivation or intent is irrelevant to a reasonableness determination. *Id.* Instead, the Court should consider whether the officers actions are "objectively reasonable." *Id.*

While reasonableness is determined by considering whether the totality of circumstances justifies the use of force, the Court has identified several factors to assist in such a determination. *Id.* These factors include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* The use of deadly force to prevent an escape is further limited and can only be reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . " *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694, 1701 (1985).

While the subjective intentions of Leonard and Vazquez are disputed, the material facts are not.[1] On the night in question, Donahue reported on the radio that he was attempting to make a traffic stop of a SUV that had been parked at a house under surveillance. (Def.'s Br. Supporting Mot. Summ. J. at 2.) Upon hearing this report, Leonard drove in the direction of Donahue. (*Id.*) Leonard's in-car camera captured a video of what Leonard could see through the windshield of his patrol car. (*Id.* at App. 175.) The video shows Leonard's patrol car driving toward flashing lights. (*Id.* at 3.) Leonard followed Donahue and Vazquez as they entered a cul-de-sac. (*Id.*) As Leonard was entering the cul-de-sac, the video shows Vazquez turning around at the end of the street. (*Id.*)

---

1. Vazquez's response lacks a coherent presentation of the facts. Accordingly, the Court is using information found in Vazquez's Amended Complaint, as well as facts contained in Defendants' Motion and Brief for Summary Judgment that Vazquez has not contested.

Once Vazquez's headlights are seen heading toward Leonard, Leonard's patrol car slows, stopping with a parked car on his right and the curb on his left. Leonard then exits the patrol car. (Pl.'s Amend. Compl. at 3.) As Leonard is bringing his car to a stop, the video shows Vazquez weaving in between Donahue's patrol car on Vazquez's left and a parked car on his right. (Def.'s Br. Supporting Mot. Summ. J. at App. 175.) After making this maneuver, Vazquez is headed toward the car parked next to Leonard's stopped patrol car. (*Id.*) Within one or two seconds of Leonard's patrol car stopping, Vazquez turns his SUV toward Leonard's patrol car and rams it. (*Id.*) After Vazquez rams Leonard's patrol car with the SUV, Vazquez continues driving over the curb next to Leonard's patrol car, where Leonard is now located. (*Id.* at 4.) Vazquez admits that he saw Leonard standing in the path of his SUV. (*Id.* at App. 101.) Immediately after seeing Vazquez ram Leonard's patrol car, thirteen shots can be heard on the video in a very rapid succession. (*Id.*) At all times while the shots were being fired by Leonard, Vazquez's SUV remained in close proximity to Leonard. (*Id.* at 4.) Two shots hit the front windshield, at which time Vazquez stated that he turned the wheel. (*Id.* at App. 101). Vazquez continued firing until the vehicle passed him. (*Id.* at 4.) After the shots were fired, Vazquez drove across another yard, crossed the street, and crashed his SUV into a fence. (*Id.*)

As a result, at the time Leonard fired his weapon at Vazquez, Vazquez was suspected of a multitude of crimes, the most severe of which included using his car as a deadly weapon when he rammed Leonard's patrol car with the SUV and when he continued driving directly at Leonard. From these actions, probable cause existed for a reasonable police officer to believe that his own safety was in immediate danger. Moreover, even after Vazquez turned the wheel away from Leonard's gunfire, a reasonable police officer would have believed, based on Vazquez's actions, that

his safety, as well as the safety of other officers and the public, were at risk if Leonard successfully escaped. This conclusion is supported by Defendants' expert, Commander Albert Rodriguez ("Rodriguez"). Rodriguez states, in his affidavit, that "any reasonable and well-trained law enforcement officer could have believed that his/her life was in imminent danger of serious bodily injury and/or death when confronted with the same or similar circumstances . . ." (Def.'s Br. Supporting Mot. Summ. J. at App. 196.) In addition, Rodriguez states that "any reasonable and prudent law enforcement officer could have believed that Vazquez presented a substantial risk of serious bodily injury and/or death, if the arrest was delayed." (*Id.*)

While Vazquez does not present any contradicting expert testimony, he does argue that a reasonable police officer would not have acted in the same manner as Leonard. In support of this argument Vazquez states that Leonard violated police policy when he placed his patrol car in the only escape channel and when he exited the car. Vazquez points to the "Disciplinary Memorandum[s]" of Deputy Chief Don Trask ("Trask") and Lt. D. Clay ("Clay"), as well as the "Letter of Disciplinary Action" and "Notice of Pre-Disciplinary Meeting" written by Chief Glen Hill ("Hill"). These documents are from the police department's internal investigation of this incident. (*Id.*) After reviewing the case file, Clay concluded that Leonard had sufficient time to move his vehicle to the right side of the road when he saw Vazquez moving toward him. (Def.'s Br. Summ J. at App. 155.) Clay also determined that Leonard should have remained in his vehicle with the protection of the airbag and seatbelt instead of exiting the car. (*Id.*) Finally, Clay found that Leonard exhibited poor weapons discipline by continuing to fire after the suspect had already passed him. (*Id.*) As a result, Clay recommended a five day suspension, training, and a period of probation. (*Id.*) Likewise, Trask reached a similar conclusion. (*Id.* at 156.) Hill informed Leonard that he

violated the department's policy of using unnecessary force.  (*Id.* at 159.)  Hill suspended Leonard for seven days without pay.  (*Id.*)  Leonard was also required to complete additional training.  (*Id.*)

The Fifth Circuit has previously considered whether an officer violated the Fourth Amendment by departing from police procedures, which results in the officer placing himself in the line of danger.  *See Young v. City of Killeen*, 775 F.2d 1349 (5th Cir. 1985); *see also Faire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992).    In *Young*, the Fifth Circuit reversed the lower court's finding of excessive force by an officer.  *Young*, 775 F.2d at 1349.  The lower court found that the officer violated police policy by, among other things, placing his patrol car in a dangerous position when attempting to block the suspect's car and by abandoning a covered position and advancing into the open.  *Young*, 775 F.2d  at 1351.  While the lower court found that the officer fired in self-defense, the court nonetheless determined that the need for force would have been avoided if the officer had followed proper police procedures.  *Id.* at 1352.  The Fifth Circuit reversed, noting that in determining whether an officer's actions are reasonable, the court is required to focus on the actions of the victim and not on the conduct of the officer.  *Id.* at 1352–53 (noting that while the conduct of an officer may be relevant to a state law negligence action, it has no bearing on the reasonableness determination of a § 1983 claim).

Likewise, in *Faire*, the plaintiff claimed that the officer violated police procedures by failing to display his badge and by failing to identify himself while in plain clothes.  *Faire*, 957 F.2d at 1275.  The plaintiff claimed that by failing to follow these procedures the officer "manufactured the circumstances that gave rise to the shooting."  *Id.*  The *Faire* court found that the officer's actions prior to the shooting were irrelevant.  *Id.* at 1276 (noting that even a negligent departure from established police procedure does not necessarily signal a violation of constitutional protections).

Instead, the courts look at whether the plaintiff's actions gave a reasonable officer cause to believe that there was a threat of physical harm when he fired the shots. *Id.* In *Faire*, the plaintiff nearly rammed the officer's car and later drove straight at him. *Id.* at 1275. Under these circumstances, the Fifth Circuit found that the officer was protected by qualified immunity. *Id.* at 1277.

Therefore, it is irrelevant to Vazquez's § 1983 action that Leonard's superiors determined that he violated department policies by stopping his patrol car instead of moving it out of the escape channel and by exiting his car. The Court instead focuses on whether Vazquez's actions leading up to the shooting provided Leonard with probable cause to believe that he, or others, were in immediate danger. As previously discussed, Vazquez rammed Leonard's police car with the SUV and then drove straight toward him. Even accepting as true the fact that Vazquez did not intend to hurt anyone, a reasonable police officer could have perceived these actions as creating a dangerous or even a life-threatening situation for himself and others.

Vazquez also claims that Leonard should have ceased firing when Vazquez was no longer driving toward Leonard. To the extent that this argument stems from the allegation Leonard violated internal police procedures, this argument is unpersuasive for the reasons stated above. To the extent that Vazquez is claiming that the number of shots fired is excessive, that argument is also unpersuasive. This argument was previously considered by the Fourth Circuit in *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996). In that case, the Fourth Circuit found that the number of shots fired by itself cannot be determinative as to whether the force used was reasonable. *Elliott*, 99 F.3d at 643. In reaching this conclusion, the Fourth Circuit found important that the officers did not empty their guns and the evidence showed that the shooting took place within a matter of seconds. *Id.* Moreover, the Fourth Circuit suggested that the number of shots fired did not mean the "officers

shot mindlessly as much as it indicates that they sought to ensure the elimination of a deadly threat." *Id.*

Similar facts are also present in this case, and the Court agrees with the Fourth Circuit's conclusion. All of the shots can be heard on the in-car video over a span of approximately two to three seconds. (Def. Br. Supporting Mot. Summ. J. at App. 175.) Leonard fired the shots in rapid succession, without interruption. (*Id.*) Leonard did not empty his gun and stopped on his on volition after Vazquez had passed him. (*Id.* at 4.) At all times, Vazquez's car remained in close proximity to Leonard. (*Id.*) When Leonard fired his weapon, Vazquez was suspected of committing numerous crimes, the most severe of which included ramming Leonard's car with the SUV and driving at Leonard. Based on these actions, a reasonable police officer had probable cause to believe that Vazquez posed a continuing threat of serious physical harm to the officers and the public during his escape attempt. (*Id.* at App. 196.) Therefore, in considering the totality of the circumstances, the amount of force used was reasonable.

### ii. Clearly Established Right

Even if the amount of force was excessive and violated the constitution, Leonard would still be protected by qualified immunity under the second part of the test. In evaluating the second part, the court looks to see if the right violated was clearly established at the time of defendant's unlawful conduct. *Saucier*, 533 U.S. at 201. As the Supreme Court recognized in *Saucier*, "[t]his inquiry, it is vital to note, must be undertaken in light of the specific context of the case not as a broad general proposition." *Id.* Therefore, for a right to be clearly established, "[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Flores*, 381 F.3d at 399–400 (citing *Anderson*, 483 U.S. at 640). Accordingly, the law

must give reasonable warning that the conduct at issue violates the plaintiff's constitutional rights. *Id.* at 400. An officer, therefore, who reasonably but mistakenly interprets the law is entitled to immunity. *Id.*

Vazquez cites to no authority that would provide an officer with reasonable warning that his conduct violates any constitutional rights. Moreover, as discussed above, there is case law indicating that negligently following police procedures does not automatically result in a constitutional violation. *See Young*, 775 F.2d at 1352–53; *Faire*, 957 F.2d at 1276. Likewise, case law also suggests that firing multiple shots is not in and of itself excessive. *See Elliot*, 99 F.3d at 643. Leonard also points to the affidavit of Rodriguez to support his contention that he did not violate clearly established law. (Def. Br. Supporting Mot. Summ. J. at 22.) Rodriguez states that

> Law enforcement officers are trained to understand that the use of deadly force to stop violent fleeing felons is reasonable and justified pursuant to the Supreme Court's decision in *Tennessee v. Garner*. Vazquez attempted to use and used deadly force against Leonard thus probable cause existed to believe that Vazquez presented an imminent threat of serious bodily harm to others.

(*Id.* at App. 197.) As a result, in Rodriguez's opinion, Leonard was justified in his decision to use force and the amount of force used. (*Id.*) The Court agrees. Clearly established law at the time of the incident does not provide Leonard with sufficient notice that his conduct violated Vazquez's constitutional rights. Even if Leonard did violate any rights, Leonard, at most, mistakenly but reasonably interpreted the law. Therefore, the Court finds that Leonard is protected by qualified immunity.

### b. The City

Plaintiff also argues that the City should be accountable for Leonard's actions. (Pl.'s Resp. at 5.) Because the Court finds that Leonard did not violate Vazquez's Fourth Amendment rights,

no liability can be extended to the City. However, even if there had been a Fourth Amendment violation, the City would still be immune from suit.

A municipality cannot be "liable for the actions of non-policy making employees under a theory of respondeat superior." *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003). Instead, a municipality can only be liable under § 1983, when "(1) a policy (2) of the city's policymaker (3) . . . caused (4) the plaintiff to be subjected to a deprivation of constitutional right." *Grandstaff v. City of Broger, Tex.*, 767 F.2d 161, 169 (5th Cir. 1985). An official policy means that there is a "policy statement, ordinance, regulation, or decision that is officially adopted" by the municipality's lawmakers or by an official who was delegated policy making authority. *Williams*, 352 F.3d at 1013. Even if such a policy exists, that policy must be the "moving force of the constitutional violation" in order to hold the municipality liable. *Grandstaff*, 767 F.2d at 169 (citing *Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978)).

Vazquez makes the conclusory assertions that the City "sanctioned the custom, practice and/or policy or procedure of excessive force." (Pl.'s Amend. Compl. at 7.) Moreover, Vazquez asserts that "the assault, beating, and shooting of citizens, with little or no justification, is a persistent and widespread practice of city employees – namely police officers – that, although not authorized by officially adopted policy, is so common and well settled as to constitute a custom that fairly represents official municipal policy." (*Id.* at 4.) Vazquez also alleges that the City covers up law enforcement misconduct. (*Id.* at 6.)

Vazquez provides no evidence supporting these conclusory allegations. Instead, the evidence shows that the City has detailed written guidelines and directives pertaining to and limiting the use of force and use of weapons. (Def.'s Br. Supporting Mot. Summ. J. at App. 2–18.) When

an officer uses force in the line of duty, he is required to submit a report to a supervisor. (*Id.* at App. 183.) The report is then reviewed by the supervisor, who may request additional review and investigation of the incident. (*Id.*) If inappropriate use of force is found, the City takes corrective measures, including referring the matter to a prosecutor, disciplining the officer, terminating the officer's employment, requiring additional training, or supervising the officer closer. (*Id.*)

The City investigated Leonard's use of force and forwarded the matter to the Dallas District Attorney's Office. (*Id.*) A grand jury no billed, or refused to charge, Leonard. (*Id.*) In spite of this finding, the City determined that Leonard's actions violated department policies, placed him on a seven day suspension, and required him to complete additional training. (*Id.*) The fact that the City investigated the shooting pursuant to its procedures contradicts Vazquez's conclusory assertion that the City policy authorizes excessive force or covers up law enforcement misconduct.

Vazquez also claims that the City is liable for inadequate training and screening of police officers. (Pl.'s Amend. Compl. at 7–8.) Again, no evidence is provided to support this allegation. The evidence shows that all police officers are required to complete the Basic Police Officer Training Academy program. (Def.'s Br. Supporting Mot. Summ. J. at App. 182.) The training program includes materials dealing with the lawful use of force, lawful arrest, and lawful search and seizure. (*Id.*) Every two years, the City requires police officers to complete forty hours of ongoing law enforcement training. (*Id.* at App. 182–83.)

Moreover, even if there was inadequate training, the Fifth Circuit has held that inadequate training alone is not ordinarily the moving force behind an injury. *Grandstaff*, 767 F.2d at 169 ("It is not enough that the city could, but does not, reduce the risk of harm to the plaintiff"). In addition, the Fifth Circuit has held that the failure to supervise is also not the moving force behind the

constitutional violation. *Id.* Therefore, because Vazquez does not point to any policy causing a deprivation of his constitutional rights, the Court finds that the City is entitled to qualified immunity.

## 2. Unlawful Search and Seizure

Vazquez also alleges that he was unlawfully seized by Leonard. In support of this argument, he claims that Defendants lacked reasonable suspicion and/or probable cause when they attempted to detain him. There is no dispute that Vazquez was seized during this incident. The Fourth Amendment protects against unreasonable seizures. U.S. CONST. amend. IV. This protection is implicated during an arrest. *Glenn v. City of Tyler*, 242 F.3d 307, 313–14 (5th Cir. 2001) (citing *Valencia v. Wiggins*, 981 F.2d 1440, 1444 (5th Cir. 1993)). When there is probable cause to believe a person has committed a crime, a police officer may arrest that person. *Garner*, 105 S.Ct. at 1699. "Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Atwater v. City of Lago*, 195 F.3d 242, 246 (5th Cir. 1999) (quoting *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995)).

However, "when an arrest is conducted in an extraordinary manner, usually harmful to an individual's privacy or even physical interests" a balancing test is required even if probable cause exists. *Id.* at 244. In conducting this balancing test, the court considers whether "the government's interest in enforcing its laws outweigh the suspect's privacy interest." *Id.* In other words, the Court determines if the totality of the circumstances justified a particular type of seizure. *Garner*, 105 S.Ct. at 1700. If so, the arrest is reasonable under the Fourth Amendment. *Atwater*, 195 F.3d at 244. The Supreme Court has found it necessary to perform this test where a "search or seizure involves

deadly force, an unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body." *Id.*

As previously discussed, probable cause existed to pull Vazquez over initially. He was leaving a house where police had previously located a stolen vehicle and drugs. (Def.'s Br. Supporting Mot. Summ. J. at 2.) Vazquez was driving a black SUV with paper license tags, which appeared to be altered. (*Id.*) He accelerated when he saw Donahue's patrol car. (*Id.*) Therefore, the officers involved had probable cause to stop Vazquez. However, because the seizure involved the use of deadly force, the Court must also balance the government's interest against the suspect's privacy interests. The Supreme Court in *Garner* analyzed these competing interests in a situation where deadly force was used to effectuate an arrest. *Garner*, 105 S.Ct. at 1700–01. The Supreme Court found that deadly force cannot be used to prevent the escape of all felons. *Id.* at 1701. However, as discussed above, use of deadly force to seize a suspect attempting to escape is reasonable when there is "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . ." *Id.* Therefore, if the suspect threatens the officer with a weapon or there is probable cause to believe the suspect committed a crime injuring or threatening to injure someone, deadly force can be used. *Id.* Vazquez's actions during the chase provided officers with probable cause to believe that Vazquez posed a serious threat to others. He rammed Leonard's patrol car with the SUV and drove at Leonard when he was outside his patrol car. (Def.'s Br. Supporting Mot. Summ. J. at App. 175.) As a result, the Court finds that Vazquez's seizure was reasonable under the Fourth Amendment.

## B. STATE LAW CLAIMS

In addition to Vazquez's § 1983 claim, he also alleges that Defendants are liable for IIED,

assault, and battery under Texas law. The City is entitled to immunity on all of Vazquez's state law claims. As a governmental entity, the City can only be sued if it waives its sovereign immunity. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2002). To determine if a valid waiver has been given, courts in Texas generally look to the constitution or a legislative enactment. *Id.* The Texas Tort Claims Act lists circumstances in which the government has waived its sovereign immunity. TEX. CIV. PRACT. & REM. CODE § 101.025(a) ("Sovereign immunity to suit is waived and abolished to the extent of liability created by this chapter."). Section 101.057 expressly preserves sovereign immunity for intentional torts. TEX. CIV. PRACT. & REM. CODE § 101.057. Accordingly, the City is immune from Vazquez's state law claims. However, as discussed below, even if the City was not protected, Leonard, and therefore the City, is not liable for IIED, assault, or battery.

### 1. Intentional Infliction of Emotional Distress

The tort of IIED is a "gap-filler." *Hoffman-LaRoche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 816 (Tex. 2005). As a "gap-filler" tort, IIED is only available "in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffman-LaRoche*, 144 S.W.3d at 447 ("The tort's clear purpose . . . was to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied."). The facts that Vazquez argues constitute IIED, also serve as the basis for his § 1983 excessive force and unlawful seizure claims. These same facts also are alleged to constitute Vazquez's state law assault and battery claims. Accordingly, because other forms of redress can be asserted on these facts, there is no gap to fill.

Moreover, even if Vazquez was allowed to proceed on his IIED claim, he is unable to establish the existence of the four required elements. To recover for IIED under Texas law, the plaintiff must show (1) that the defendant acted intentionally or recklessly; (2) that the defendant's conduct is extreme and outrageous; (3) that the defendant's actions caused the plaintiff emotional distress; and (4) that the emotional distress suffered by the plaintiff was severe. *Hoffman-LaRoche*, 144 S.W.3d at 445. While Vazquez alleges that he suffers from emotional distress that requires treatment, there is no evidence presented indicating what treatment he received. (Pl.'s Amend. Compl. at 8–9.) As a result, there is no evidence supporting the conclusory allegation that his emotional distress is severe. Finally, even if Vazquez could demonstrate he was suffering from severe emotional distress, he still has failed to show that Defendants' conduct is extreme and outrageous. A defendant's conduct can only be considered extreme and outrageous if it goes beyond all bounds of possible decency. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006). Leonard fired his weapon as Vazquez was driving toward him and after Vazquez had previously rammed his car with the SUV. Vazquez's conduct placed Leonard and others in immediate danger, thereby justifying Leonard's use of force. This use of force does not qualify as extreme and outrageous conduct. Plaintiff has, therefore, failed to show IIED.

### 2. Assault and Battery

Vazquez also alleges Defendants are liable for assault and battery. A battery is committed, under Texas law, when there is a harmful or offensive contact with a plaintiff's person. *Garza v. U.S. Marshals Service*, No. B-07-052, 2008 WL 501292, at *5 (S.D. Tex. 2008). The definition of a civil assault is the same as the criminal assault definition. *Id.* "A person commits an assault if he "intentionally or knowingly causes physical contact with another when the person knows or should

reasonably believe that the other will regard the contact as offensive or provocative." TEX. PENAL CODE § 22.01(a)(3) (Vernon 2004). The elements to establish an assault are (1) the apprehension of (2) an immediate battery. *Garza*, 2008 WL 501292, at *5.

"Texas law grants government employees official immunity from suits arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority. *City of Harlingen v. Vega*, 951 S.W.2d 25, 30 (Tex. App. - Corpus Christi, 1997). *See also City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). An officer acts in good faith if "a reasonable and prudent . . . officer could have believed his conduct was lawful in light of clearly established law and the information possessed by him at the time he made his decisions . . . " *Texas Dept. of Public Safety v. Perez*, 905 S.W.2d 695, 699 (Tex. App. - Houston [14th Dist.] 1995). This test is derived substantially from the test for federal qualified immunity. *Chambers*, 883 S.W.2d at 656. Like the federal qualified immunity, official immunity focuses on objective reasonableness, not subjective good faith. *Id.* Any difference between the official immunity and qualified immunity standards is immaterial in this case. Accordingly, for the reasons stated above, Leonard is entitled to official immunity under Texas law on Vazquez's assault and battery claims.

## CONCLUSION

Leonard and the City are immune from suit. Leonard's use of force when arresting Vazquez was objectively reasonable. Vazquez rammed Leonard's patrol car with the SUV and drove at Leonard when he was on foot. A reasonable officer would have believed that his own safety, as well as the safety of other officers and the public, were in immediate risk if Vazquez escaped. Moreover, the law does not provide warning to officers that using force in these circumstances would have

violated the Constitution. Because other forms of redress exist, IIED is not applicable. Even if it were applicable, there is no indication that Vazquez suffered severe emotional distress or that Leonard's conduct was extreme and outrageous. Leonard is also protected by official immunity under Texas law. Therefore, Vazquez cannot prevail on his assault and battery actions. The City has not waived its sovereign immunity and cannot be sued for intentional torts. For these reasons, the Court recommends that the District Court **GRANT** Defendants' Motion for Summary Judgment.

      **SO ORDERED.** June 23, 2008.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).